IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 11, 2015

## STATE OF TENNESSEE v. DONALD RAY WILLIAMS

**Appeal from the Circuit Court for Putnam County**
**No. 12-0692A      Leon C. Burns, Jr., Judge**

_____

### No. M2014-00877-CCA-R3-CD – Filed June 2, 2015

_____

A Putnam County jury convicted the Defendant-Appellant, Donald Ray Williams, of attempted second degree murder, a Class B felony; especially aggravated robbery, a Class A felony; and especially aggravated kidnapping, a Class A felony. The trial court sentenced the Defendant to ten years at thirty percent release eligibility for the attempted second degree murder conviction, twenty years at one hundred percent release eligibility for the especially aggravated robbery conviction, and twenty years at one hundred percent release eligibility for the especially aggravated kidnapping conviction. The trial court ordered the twenty-year sentences to be served consecutively to one another and concurrently with the ten-year sentence, for an effective forty-year sentence in the Department of Correction. The sole issue presented for our review is whether the trial court erred in sentencing the Defendant. Upon review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROGER A. PAGE, JJ., joined.

Michael J. Rocco, Sparta, Tennessee, for the Defendant-Appellant, Donald Ray Williams.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Randall A. York, District Attorney General; and Anthony Craighead, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

This case arises from the robbery and severe beating of the victim, Bruce Stewart, on the night of July 1, 2012, at an apartment in Cookeville. The Putnam County Grand Jury subsequently indicted the Defendant-Appellant, Donald Ray Williams, for attempted

second degree murder, especially aggravated robbery, and especially aggravated kidnapping.

After a trial on November 6, 2013, the jury found the Defendant guilty as charged on all three counts. In this appeal, the Defendant does not challenge the sufficiency of the evidence to support his convictions. He contends only that the trial court erred in sentencing him. The following is a brief summary of the proof presented at trial.

The victim testified that he had known the Defendant's sister, Christina Douglas, since seventh grade. On the evening of July 1, 2012, Douglas contacted the victim asking for help to pay her rent. Although Douglas was married, she and the victim had engaged in consensual sex before. On this particular occasion, the victim went to Douglas's apartment at around 10:30 p.m. with $360 in exchange for sex.

When the victim arrived, the apartment was dark. He set his iPhone down and within thirty seconds of his arrival, the Defendant and another man struck him from behind with bats. The victim was first hit in the head. He attempted to fend off the attack but was intermittently beaten for an hour and a half. He said that Douglas complained about the blood on her apartment floor, so the men moved the victim to the bathroom.

During the first hour of the beating, the men did not say anything, but then they repeatedly demanded the victim's wallet. They took $360 from the victim's wallet as well as the victim's iPhone. The victim did not leave because he was locked in the apartment. When he tried to unlock the door, the assailants broke his hand. He said he was kept in the bathroom for about forty-five minutes to an hour. He estimated that he was at the apartment for a total of two hours and forty-five minutes.

The victim stated that the Defendant appeared to be the leader and repeatedly ordered the other man to hit the victim. The victim never lost consciousness, and he described his level of pain as "pretty extreme." He said that the men "just kept swinging[.]" He heard Douglas say that the neighbors were complaining about the noise, and his assailants then opened the door and left the apartment without a word. The victim also left and drove home. He did not realize how critical his condition was until he arrived at the hospital the following day.

The victim was hospitalized for four days. He had multiple skull fractures, massive bleeding in the brain, a torn lip, and two black eyes. He had a broken finger on his left hand, a bruised heart, bleeding in the lungs, two broken ribs, and hemorrhaging from the waist up. His injuries required a metal plate and screws to be placed in his head. The victim identified photographs taken about a week after the beating which depicted

the extensive bruising on his torso. These photographs were shown to the jury and admitted into evidence without objection.

Officer Brian Long of the Cookeville Police Department responded to the assault call and interviewed the victim at the emergency room. He testified that the victim's injuries were "very severe." He said that the victim had cuts and bruises all over his head and back and "probably needed stitches in some areas." Officer Long identified photographs taken at the emergency room depicting the victim's various head and back injuries. These photographs were published to the jury and were admitted into evidence without objection.

Christina Douglas testified that she pled guilty to facilitation of robbery in exchange for three years' probation and for her testimony in this case. She said that her brother, the Defendant, began living with her in June 2012 because he had nowhere else to go. On July 1, 2012, she told the Defendant that the victim was coming to the apartment to lend her money. The Defendant responded that he wanted to rob the victim. Specifically, the Defendant wanted to render the victim unconscious, steal his money, and then let the victim leave once he regained consciousness. Douglas said that she "was afraid to tell [the Defendant] no." She stated that neighbor Josh Graves also participated in robbing the victim.

Once the victim arrived, Douglas led him to the bedroom as instructed. The Defendant and Graves then emerged from the adjoining bathroom armed with a bat and a wrench and repeatedly struck the victim for about forty-five minutes. According to Douglas, the two men would sometimes pause and laugh before continuing to hit the victim. She said that both the apartment and the victim's face were bloody. Douglas described the victim's injuries as follows, "His eye was almost hanging out of the socket. He had cuts everywhere. They had somehow managed to get his shirt off, and he had welts and marks from the ribs up."

Both the Defendant and Graves told Douglas that "they might as well kill [the victim], to finish him off." However, the Defendant eventually allowed the victim to leave. Douglas estimated that the victim was at the apartment for three to four hours. In the event that the police became involved, the Defendant told Douglas to allege that the victim attempted to rape her and that the Defendant beat the victim in self-defense. The Defendant told Douglas "to just stick to the story . . . and everything would be okay."

Detective Chase Mathis of the Cookeville Police Department visited Douglas's apartment on July 2, 2012 to investigate the assault. He took several photographs of what he observed at the apartment that day, and he individually identified the photographs for the jury. The photographs depicted red droplets on the living room couch, on picture

frames, on the walls, on a piece of paper, and on the floor. Detective Mathis testified that there was blood spatter on the ceiling and on all four walls of the bedroom. He said that the red droplets on the bedroom walls were "cast-off" blood stains. He also noted "a shot gun pattern" of red droplets on the wall above the bed. Detective Mathis explained that the size of the droplet stains indicate the type of impact and that "the harder the impact . . . [the] more the blow-up of the little droplets of blood[.]" He stated that "cast-off" stains on the wall were the result of "something being used when the blood gets on it, and then you sling it back and sling it forward, it makes the spotting worse." Detective Mathis agreed that there was high-impact spatter on every wall of the living room, bedroom, and bathroom. The apartment photographs were admitted into evidence without objection.

**Sentencing Hearing.** At the January 14, 2014 sentencing hearing, Sarah England of the Board of Probation and Parole testified that she prepared the Defendant's presentence report. She said that the Defendant's criminal history consisted of one prior conviction for second degree murder. He was convicted on December 20, 1991, and received a twenty-five-year sentence. The Defendant committed the offense on August 29, 1990, when he was seventeen, and he was released from custody on January 15, 2009. While he was incarcerated, the Defendant obtained his GED and took anger management courses. He was denied parole during the entirety of his sentence. The State introduced the presentence investigation report into evidence.

The report also included a victim impact statement from Bruce Stewart. The victim described receiving the following injuries: "Multiple skull fractures, bleeding in brain, 2 broken ribs, left hand broken, bruised heart. Lost 3 pints of blood. Lungs were filled with blood. Damage to teeth and jaw that caused problems eating for 8-10 weeks." The victim reported the following medical treatment: "ICU for 2 days, 2 more days in hospital. CAT scans, MRI's. Cast on left hand for 6 weeks." He further stated that he missed six weeks of work as a result of his injuries.

After hearing arguments from counsel, the trial court applied the enhancement factors that the Defendant had a previous history of criminal convictions or criminal behavior and that the Defendant was a leader in the commission of the offenses, which involved two or more criminal actors. See T.C.A. § 40-35-114(1), (2). The court did not find any applicable mitigating factors. In reaching its sentencing decision, the trial court was particularly troubled by the severity of the injuries inflicted upon the victim:

> The victim testified in this case that, basically, he walked in the door, put his keys down, and bam, he got hit from behind with a baseball bat, and this beating continued for several minutes, forty-five minutes to an hour. And then later, he was pushed into -- put in the bathroom and was beaten some more. He was in there, he says, for three hours or so. At least

there was some testimony that he was in there.  They'd come by and laugh at him, and beat him an hour and a half or so.  And then after an hour and a half, kept saying, "Give us your wallet."  They took cash off of him and an [iP]hone.  He tried to leave, but couldn't get out.  His hand was broken.  He was in the bathroom forty-five minutes or so.  The [D]efendant was saying, kept saying to others, "Hit him, hit him."  The witness -- the victim said he seemed to be in charge, had a bat, or some blunt object.  He said also that his pain level was extreme.

Some of the worst pictures of the beating of any individual I've ever seen.  Large red welts indicating that the bat didn't just graze, but was struck very forcefully into the body and left a wide imprint, a long and wide imprint, causing these bruises and red, red marks.

You know, during this process, there were children in the house.  The neighbor said -- I think got upset over the noise going on.  It went on for a long time.

It seems to me there were some other points that were important here.  At one point, the [D]efendant is accused -- was accused of saying, "Just go ahead and kill him."  The sister said, "No."  She believed that the [D]efendant here was truthful about the attitude to kill him.  He was also involved in trying to perpetrate false testimony, you might say, or telling the sister there to, "We've got a story, let's stick with it," which was not a truthful story in response to this.

So, all and all, it is very hard to understand how the victim survived.  The worst beating I've had any dealings with in any case in the 38 years that I've been here.  With things like this, usually, people are basically killed.  They kept hitting him, she said.  She asked them to stop, and they wouldn't.  For forty-five minutes, they kept beating him, beat him down the hall and into the bathroom and kept him there.  She was scared to call for help or run.

The trial court sentenced the Defendant as a Range I, standard offender to ten years for the attempted second degree murder, twenty years for the especially aggravated robbery, and twenty years for the especially aggravated kidnapping.  The court found these middle-of-the-range sentences to be appropriate based on the circumstances of the offenses.  In determining the alignment of the sentences, the trial court found that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life.  See T.C.A. § 40-35-115(4).  The court ordered partial consecutive

sentencing and aligned the twenty-year sentences consecutively to one another and concurrently with the ten-year sentence, for a total effective sentence of forty years. The Defendant now timely appeals the trial court's sentencing decision.

## ANALYSIS

On appeal, the Defendant argues that the trial court imposed excessive sentences. Specifically, he contends that the trial court erred in its application of enhancement factors and in failing to consider mitigating factors. He further claims that the trial court failed to make the requisite findings to support consecutive sentencing based on the dangerous offender category. The State responds that the trial court did not abuse its discretion in sentencing the Defendant. We agree with the State.

We review the length and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). Moreover, the misapplication of enhancement or mitigating factors does not invalidate the imposed sentence "unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld." Id. The defendant has the burden of showing the impropriety of the sentence on appeal. T.C.A. § 40-35-401(d), Sentencing Comm'n Cmts.

Pursuant to the 2005 amendments to the Sentencing Act, a trial court must consider the following when determining a defendant's specific sentence and the appropriate combination of sentencing alternatives:

(1) The evidence, if any, received at the trial and the sentencing hearing;
(2) The presentence report;
(3) The principles of sentencing and arguments as to sentencing alternatives;
(4) The nature and characteristics of the criminal conduct involved;
(5) Evidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114;
(6) Any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
(7) Any statement the defendant wishes to make in the defendant's own behalf about sentencing.

Id. § 40-35-210(b)(1)-(7). In addition, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the

-6-

sentence alternative or length of a term to be imposed." Id. § 40-35-103(5). The court must impose a sentence "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Id. §§ 40-35-103(2), (4).

With regard to his especially aggravated kidnapping conviction, the Defendant argues that the trial court should have applied the mitigating factor that "the offender voluntarily release[d] the victim alive[.]" See id. § 39-13-305(b)(2). At the sentencing hearing, the trial court considered the Defendant's requested mitigation:

> No mitigators were offered, except that he turned him loose at the end, allegedly. I don't guess there's any dispute, if we believe the testimony, that [the Defendant] then walked the . . . victim back to his car and he got -- they went out the door together. I don't know that he helped him necessarily, but he didn't restrain him from going to his car and leaving. But he didn't offer any help necessarily.
>
> You look at mitigating, you look at enhancements. I don't see any mitigating factors.

The record reflects that the Defendant assaulted the victim with a baseball bat for approximately three hours. When the victim attempted to leave, the assailants broke his hand. The beating was so severe that there was blood spatter on every wall of the apartment, and the victim was hospitalized for four days. At trial, Douglas testified that the Defendant wanted to kill the victim: "He said that they were going to go ahead and kill him because he was going to die anyway if they let him go, and I told them, no, just to let him go." Based on the proof, we conclude that the trial court did not did not err in giving little to no weight to this mitigation factor. See, e.g., State v. Theotus Barnett, No. W2012-00048-CCA-R3CD, 2013 WL 2297128 (Tenn. Crim. App. May 22, 2013) (finding voluntary release mitigating factor inapplicable to defendant's especially aggravated kidnapping conviction where the eight-month pregnant victim was severely beaten and confined for two hours and where prior to fleeing, the defendant took the victim's driver's license and threatened to kill her if she notified the police). Even if the trial court erred by failing to apply this factor, "a trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." Bise, 380 S.W.3d at 709. We conclude that the trial court did not abuse its discretion in imposing a mid-range twenty-year sentence for the Defendant's especially aggravated kidnapping conviction.

The Defendant also asserts that the trial court improperly enhanced his sentences based on the brutality of the offenses. He contends that during the sentencing hearing,

the trial court emphasized the severity of the victim's injuries even though serious bodily injury is an element of especially aggravated robbery and especially aggravated kidnapping. The record reflects that although requested by the State, the trial court declined to apply enhancement factor (6), that the personal injuries inflicted upon the victim were particularly great. See T.C.A. § 40-35-114(6). At the sentencing hearing, the trial court stated:

> The [S]tate suggests that the personal injuries were great. I believe that might be included in the offense, because, to be an especially aggravated robbery or especially aggravated kidnapping, there has to be serious bodily injury. I agree, however, that these injuries were well beyond what might be the initial threshold for serious bodily injury.
>
> I'm not sure that we could stack them all and then say, "Well, it's more serious than just serious." Under the wording of the statute, it just says, "serious", and the degrees of seriousness have not been spelled out. Although, I clearly agree that this was serious, very serious bodily injury.

Ultimately, the trial court applied two enhancement factors, neither of which was disputed by the defense: that the Defendant had a previous history of criminal convictions and that the Defendant was a leader in the commission of the offenses. See id. § 40-35-114(1), (2). In his brief, the Defendant complains that the trial court spent a significant amount of time "detailing aspects of the crime which were completely irrelevant to the enhancement factors that the court imposed." However, we note that a trial court is statutorily required to consider the evidence presented at trial and at the sentencing hearing, as well as the nature and characteristics of the criminal conduct involved in reaching its sentencing decisions. See id. § 40-35-210(b)(1), (4).

Because the statutory enhancement and mitigating factors are advisory only, and because "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion[,]" we conclude that the trial court did not err in its sentencing determinations. See id. § 40-35-114(c)(2); State v. Carter, 254 S.W.3d 335, 345 (Tenn. 2008); see also Bise, 380 S.W.3d at 706 (holding that "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005"). Accordingly, we uphold the Defendant's middle-of-the-range sentences.

Next, the Defendant contends that the trial court improperly imposed consecutive sentencing. Specifically, he alleges that the court merely recited the statutory language and failed to make the requisite findings to establish that he was a dangerous offender. Where a defendant is convicted of one or more offenses, the trial court has discretion to

decide whether the sentences shall be served concurrently or consecutively.  T.C.A. § 40-35-115(a).  The Tennessee Supreme Court has held, "[T]he abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations."  State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013).  A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of seven categories enumerated in code section 40-35-115(b).  Those categories include:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;
>
> (6) The defendant is sentenced for an offense committed while on probation; or
>
> (7) The defendant is sentenced for criminal contempt.

T.C.A. § 40-35-115(b).  An order of consecutive sentencing must be "justly deserved in relation to the seriousness of the offense."  Id. § 40-35-102(1); see State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002).  In addition, the length of a consecutive sentence must be "no greater than that deserved for the offense committed."  T.C.A. § 40-35-103(2); see Imfeld, 70 S.W.3d at 708.

In this case, the trial court imposed consecutive sentencing after finding that the Defendant was a dangerous offender whose behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high. See T.C.A. § 40-35-115(b)(4). The Pollard court explained that two additional findings must be made when applying the dangerous offender classification:

"Proof that an offender's behavior indicated little or no regard for human life and no hesitation about committing a crime in which the risk to human life was high, is proof that the offender is a dangerous offender, but it may not be sufficient to sustain consecutive sentences. Every offender convicted of two or more dangerous crimes is not a dangerous offender subject to consecutive sentences; consequently, the provisions of [s]ection 40-35-115 cannot be read in isolation from the other provisions of the Act. The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender. In addition, the Sentencing Reform Act [of 1989] requires the application of the sentencing principles set forth in the Act applicable in all cases. The Act requires a principled justification for every sentence, including, of course, consecutive sentences."

Pollard, 432 S.W.3d at 863 (quoting Wilkerson, 905 S.W.2d at 938). Therefore, when imposing consecutive sentences pursuant to the dangerous offender classification, the trial court must conclude that the proof establishes that the aggregate sentence is "reasonably related to the severity of the offenses" and "necessary in order to protect the public from further criminal acts." Id. (quoting Wilkerson, 905 S.W.2d at 938). Unlike the other six subsections, the trial court must make additional findings for the dangerous offender classification because it is "the most subjective and hardest to apply." State v. Lane, 3 S.W.3d 456, 461 (Tenn. 1999).

At the sentencing hearing, the State argued for consecutive sentencing on the basis that the Defendant was a dangerous offender. The State specifically articulated the requisite findings for the court to justify consecutive sentencing:

[V]ery recently the Court of [Criminal] Appeals has issued an opinion in the State of Tennessee vs. James Pollard, . . . in which they talk about consecutive sentencing: "The aggregate sentence is . . . reasonably related to the severity of the offense . . . and necessary in order to protect the public from further criminal acts."

Now, what this case talks about is, that the sentencing [c]ourt has to

-10-

put on the record, either in writing or orally, the elements and the reasoning for their consecutive sentencing, and I think that's appropriate. But it just seems to the [S]tate that a forty (40) year sentence would be reasonably related to the severity of the offense, and necessary in order to protect the public from further criminal acts, and that is what the [S]tate is asking for in this case.

Regarding the severity of the offenses, the State described in detail the injuries that the victim suffered and the consequences of the Defendant's conduct. Regarding the need to protect the public from further criminal acts, the State noted that the Defendant committed an attempted second degree murder only three years after his release from prison for his 1990 conviction for second degree murder. Accordingly, the State asserted that consecutive sentencing would serve the public interest and was justified based on the injuries inflicted upon the victim.

In determining the appropriate sentence, the trial court expressed concern that the Defendant would repeat his criminal acts: "The circumstances of this crime would suggest to the [c]ourt that it's possible, the attitude that he had, that he might violate the law again and with similar conduct." Ultimately, the court ruled as follows:

> . . . [I]t seems to me to suggest that clearly [the Defendant] is a dangerous offender, and his behavior indicates little or no regard for human life, and seemed to take pleasure in holding [the victim] and beating upon him at will, and so, under the circumstances, I believe the [S]tate's position is supported by the proof, and that the proof suggests that [the Defendant] should be given a consecutive sentencing.

Here, the trial court specifically adopted the State's arguments regarding the dangerous offender category and incorporated them into its factual findings. In addition, the court emphasized the severity of the offenses involved, noting that the photographs of the beating were some of the worst it had ever seen. The court further stated that it did not understand how the victim survived. Because the State specifically applied the additional findings required by Wilkerson, we conclude that the trial court did, in fact, determine that consecutive sentencing was reasonably related to the severity of the offenses and the need to protect the public from the Defendant's future criminal conduct. Accordingly, we conclude that the trial court properly imposed consecutive sentencing.

The record reflects that the trial court carefully considered the evidence, the enhancement and mitigating factors, and the purposes and principles of sentencing prior to imposing partially consecutive, within-range sentences of confinement in this case.

Therefore, the Defendant has failed to establish that the trial court abused its discretion in imposing an effective forty-year sentence, and he is not entitled to relief.

## **CONCLUSION**

Based on the foregoing authority and analysis, we affirm the judgments of the trial court.

_____
CAMILLE R. McMULLEN, JUDGE